BOUTALL, Judge.
This is an appeal by a defendant driver from an adverse judgment arising out of an automobile collision. The main issues are the extent of personal injuries and quantum.
The facts show that Mrs. Dorothy Napp was a passenger in an automobile being driven by her husband on Louisiana Highway 48 in Kenner, Louisiana; that when *811 the vehicle reached the intersection with Farrar Avenue, a vehicle approaching from the opposite direction suddenly turned left to turn into Farrar Avenue and collided with the plaintiff vehicle. Mrs. Napp was thrown forward into the windshield and then sideways across the front seat. She sues for her personal injuries, and her husband sues for the expenses incurred in connection with these injuries and for damages to the community automobile. The trial judge rendered judgment in her favor in the amount of $15,000.00 and judgment in favor of Mr. Napp in the amount of $2,500.00. Appellant contends that these awards were excessive.
From the voluminous and sometimes conflicting medical testimony at the trial, it appears that Mrs. Napp’s most serious problem is her left leg, particularly about the knee. However, the testimony of the two treating physicians is such that it appears that a determination of the precise nature of her leg condition has not been made. Her leg continued to be swollen and painful from the date of the accident down through the date of trial, at which time she was still being treated for her leg. The proof is conclusive, however, that her leg is swollen and painful, and that the condition was caused by the accident in which she was involved. No prognosis was reached as to the length of time necessary to effect a cure.
We believe the following to be a fair summation of evidence contained in the record. As a result of the collision, Mrs. Napp was thrown forward and was knocked unconscious from hitting the windshield. She stated that, when she returned to consciousness, her leg was punctured and bleeding, and her face and head felt enlarged. She was taken to Ochsner Foundation Hospital, where her leg, head and hip were x-rayed, and she was sent home with an ice bag on her leg. At home, she was carried to her bed and did not get up at all until the following week when she walked downstairs to talk to Mr. Cavallino, who had come to inquire as to her health. The next day she returned to Ochsner for more x-rays. She then returned to her bed because her leg was paining her so bad, and continued bed rest for some three months or more. The record fails to disclose the nature of the treatment received by Mrs. Napp at Ochs-ner Foundation Hospital or what course of treatment may have been prescribed.
Twelve days after the accident, when Mrs. Napp was still confined to bed, her leg became so swollen and so painful that on February 11, 1971 she visited Dr. Blaise Salatich for her injuries, and she has been treated by him ever since. We note at this time that although there was an offer of Dr. Salatich to testify as an expert in the field of orthopedic surgery, the record does not disclose that the court accepted or rejected the offer. Upon objection being made to the doctor’s qualifications, the court simply ruled “Subject to that objection, go ahead.” Absent some indication by the trial court to the contrary, we must assume that he was permitted to testify as a qualified medical doctor and as the treating physician.
Dr. Salatich testified that on Mrs. Napp’s first visit he gave her a complete orthopedic examination and that he noted pain, stiffness, and difficulty with leg, shoulder, and arm movements in all directions. There was generalized. soft tissue hardening of the lower left leg and ankle with marked tenderness in the area. The wound near the left knee had a small scab and a scarring effect. The left shoulder was stiff in all directions and her personal appearance suggested a painful and distressed state. She complained of a stiff neck and headaches. There was tenderness and localized pain in the area of the ball of the humerus, which is the bone in the upper arm to which the muscles for raising and lowering the arm are attached. He prescribed pain killers which were in the upper limits of nonnarcotic strength, and also a type of penicillin, and put her on enzymes to reduce swelling of her knee *812 and leg. She was told to take two hot baths a day and to stay in bed, except for bathroom purposes. She was fitted with and wore an elastic compression type stocking which involved her ankle, foot and lower leg, and later, her knee. She was told to keep her leg elevated. Later an Ace bandage type of binding was used above the stocking to raise the compression to the mid-thigh area. Her treatment continued in this fashion for approximately two months; then, in April 1971, since she did not seem to be progressing and since he thought that Mrs. Napp might have thrombophlebitis, he referred her to Dr. Charles V. Menendez, a vascular surgeon.
Dr. Menendez examined Mrs. Napp and found that her left leg was indeed painful, swollen and tender, but he concluded that she did not have phlebitis. He thought that the symptoms she was having stemmed from injury to her knee, her ankle, her hip, and possibly to her back, rather than phlebitis. He saw Mrs. Napp again in consultation with Dr. Salatich, in November, 1971 as a result of a flareup of her problems, and along with his previous recommendations, he had her wear a heavier elastic stocking.
In October, 1971, the defendant insurer sent Mrs. Napp to Dr. Hyman R. Soboloff, an orthopedic surgeon, for examination. His examination was only directed towards the injury to her leg, and he found Mrs. Napp’s leg to be swollen and painful and had brawny edema extending from the mid-thigh all the way down to the ankle. He found restrictions in bending of the knee and of the ankle and hypersensitivity of the muscles and tissues of the entire left leg. He had x-rays made and found no evidence of any boney injury or abnormality and as a result felt that she had a vascular problem, either a phlebo thrombosis or a thrombophlebitis and that she should be under the care of a vascular specialist.
Mrs. Napp continued to exhibit these symptoms in her leg despite the treatment' of Dr. Salatich and the occasional reference to Dr. Menendez, down through date of trial (February 16, 1973). At that time she testified that she still had severe problems with her leg, and it was the opinion of both treating physicians that she would continue to have these problems for a period of several years; however, neither doctor was satisfactorily able to explain why her condition would not heal or how to cure it.
In addition to the problem with her leg, it is apparent from the testimony of Mrs. Napp, Dr. Salatich, and Dr. Hopkins (a radiologist) that Mrs. Napp also experienced from time to time some problems with her neck and shoulders. She complained of headaches and pain in her neck, together with stiffness and soreness in her shoulder from the time of the accident and occasionally down through the present. Dr. Hopkins exhibited some x-rays of Mrs. Napp’s cervical spine, taken just before the trial, which demonstrate some scoliosis and some asymmetry of the relationship between the adontoid process and the lateral masses of the axis. While there is some question as to the degree of scoliosis and asymmetry presented by the x-rays, an overall view of the testimony convinces us that Mrs. Napp did suffer some injury to the neck and shoulder and suffered pain as a result thereof.
The trial judge awarded Mrs. Napp $15,000 for her injuries, and based upon the evidence presented we cannot say that this amount is manifestly excessive.
The other item of damages complained of is special damages awarded to Mrs. Napp’s husband. The trial judge did not attempt to specify amounts for any particular items, but awarded only a lump sum: “For past and future medical expenses, for the destruction of his automobile and for any and all other expenses incurred by him.” The parties stipulated certain medical and drug expenses in the amount of $386.20. To this we would add the charge of Dr. Salatich for $385.00 and the sum of $35.00 for expenses in attending the medi *813 cal treatment for a total of $806.20 in proven medical expenses. As to what constitutes the remainder of the award, we can only speculate.
The evidence reflects that the automobile belonging to Mr. Napp was a total loss. The vehicle was a 1965 Studebaker hardtop Daytona, 2 door with power steering, power brakes, air-conditioning and bucket seats. The automobile was purchased September 30, 1968 in a used condition. Mr. Napp first testified that he paid $900.00 for the automobile, but later 'changed his testimony to $700.00 and then announced that he didn’t remember what he paid. A used car lot manager testified that the retail value of such an automobile as of the date of the accident would be about $750.-00. Since the vehicle lessened in value from its purchase date, we accept the figure of $750.00; however, this leaves slightly under $1,000 for future medical expenses.
It is apparent from the testimony of the two treating physicians that Mrs. Napp will have some future treatment, although neither of them appears to be able to say what will constitute such treatment. What is evident is that her condition will continue for some time, possibly for years. Though the exact amount and type of future treatment may be said to be speculative, we were admonished in the case of Fox v. State Farm Mutual Automobile Insurance Company, et al., La., 288 So.2d 42, dated December 3, 1973, Rehearing Refused January 11, 1974; that we should hold apparently speculatory future wages are within the realm of damages envisioned within Louisiana Civil Code Article 1934(3). Under the rationale of that case, since we are convinced that some future medical expenses will be incurred, we must say that the speculation of the trial judge cannot be superceded by the speculation of this court, and accordingly we affirm the amount awarded.
For the reasons hereinabove expressed, we are of the opinion that we cannot find the amounts awarded herein are manifestly excessive and erroneous, and we affirm the judgment appealed from. Costs of the appeal are assessed against appellant.
Affirmed.